SCHLICHTER, BOGARD & DENTON
JERRY J. SCHLICHTER (054513)
jschlichter@uselaws.com
DANIEL V. CONLISK *(Pro Hac Vice)*
dconlisk@uselaws.com
HEATHER LEA *(Pro Hac Vice)*
hlea@uselaws.com
MARY L. PERRY (175911)
mperry@uselaws.com
100 South Fourth Street, Suite 900
St. Louis, MO  63102
Telephone:  (314) 621-6115
Facsimile:  (314) 621-7151

*Attorneys for Plaintiffs and Class Representatives*

FUTTERMAN & DUPREE LLP
JAMIE L. DUPREE (158105)
160 Sansome Street, 17th Floor
San Francisco, California 94104
Telephone:  (415) 399-3840
Facsimile:  (415) 399-3838
jdupree@dfdlaw.com

*Local Attorneys for Plaintiffs and Class Representatives*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BEVERLY KANAWI and SALVADOR AQUINO, as representatives of a class of similarly situated person, and on behalf of the Plan,<br><br>    *Plaintiffs,*<br><br>        v.<br><br>BECHTEL CORPORATION, THE BECHTEL TRUST AND THRIFT PLAN COMMITTEE, PAM DAMSGAARD, and PEGGI KNOX,<br><br>    *Defendants.* | Case No. C 06-05566 CRB<br><br><br><br><br><br>**SECOND AMENDED COMPLAINT**<br>**DEMAND FOR JURY TRIAL**<br>**CLASS ACTION** |

1

1

## INTRODUCTION

2    1.    Personal savings accounts, such as 401(k)s, are quickly becoming employees'
3 primary method of financially planning for retirement.  An increasing number of companies
4 recently have announced the termination of traditional defined benefit pension plans and their
5 replacement by defined contribution 401(k) plans.  For many employees in the United States
6 today, an employer-provided defined benefit pension awaiting their retirement is a quaint,
7 historical notion.

8    2.    In 401(k) plans, employers provide an opportunity for employees to save their
9 own pre-tax dollars in individual 401(k) accounts.  The accounts provide a number of investment
10 alternatives into which employees place a portion of their current income with the hope of
11 earning, over time, a return sufficient to support themselves and their families in retirement.

12    3.    Accordingly, in 401(k) plans, the return on employees' investments is critical.
13 Even seemingly small reductions in a participant's return in one year may substantially impair his
14 or her accumulated savings at retirement.

15    4.    While such reductions in 401(k) accounts' returns may result from market
16 fluctuations, a consistent - albeit rarely discussed - force reducing 401(k) accounts' earnings is the
17 administrative fees and expenses assessed against account balances.

18    5.    The most certain means of increasing the return on employees' 401(k) savings is
19 to reduce the fees and expenses employees pay from their 401(k) accounts.

20    6.    Unlike generalized market fluctuations, employers can control these fees and
21 expenses.  Federal law requires them to do so.

22    7.    Under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001
23 *et seq*. ("ERISA"), an employer who provides a 401(k) plan for its employees is a "Plan Sponsor."
24 The employer or its agent may also serve as "Plan Administrator," or the employer may appoint a
25 third party to serve as such.  Both the Plan Sponsor and the Plan Administrator are fiduciaries of
26 the 401(k) plan.  The Plan Administrator performs or contracts for administrative, record-keeping,
27 investment management, and other services from entities in the financial and retirement industry.

28

2

1   ERISA requires that the fees for these services must be reasonable, incurred solely for the benefit

2   of Plan participants, and fully disclosed.

3       8.      For providing various services, third-party plan administrators, record-keepers,

4   consultants, investment managers, and other vendors in the 401(k) industry have developed a

5   variety of pricing and fee structures.

6       9.      At best, these fee structures are complicated and confusing when disclosed to

7   Plan participants.  At worst, they are excessive, undisclosed, and illegal.

8       10.      In this action,  pursuant to ERISA § 502(a),  29 U.S.C. § 1132(a), Plaintiffs and

9   Class Representatives Beverly Kanawi, and Salavador Aquino, on behalf of the Bechtel Trust and

10  Thrift Plan, Plan No. 001 (the "Plan") and similarly situated participants and beneficiaries in the

11  Plan, seek to recover the losses suffered by the Plan and to obtain injunctive and other equitable

12  relief for the Plan from Bechtel Corporation ("Bechtel"), the Plan Sponsor, and the Bechtel Trust

13  and Thrift Plan Committee, the Plan Administrator (the "Committee"), and other defendants

14  identified below (collectively "Defendants") based upon breaches of their fiduciary duties.

15      11.      As set forth in detail below, the fees and expenses paid by the Plan, and thus

16  borne by Plan participants, were and are unreasonable and excessive; not incurred solely for the

17  benefit of the Plan and its participants; and undisclosed to participants.  By subjecting the Plan

18  and its participants to these excessive fees and expenses, and by other conduct set forth below,

19  Defendants violated their fiduciary obligations under ERISA.

20                          **PARTIES, JURISIDCTION AND VENUE**

21                                      **Plaintiffs**

22      12.      Plaintiff and Class Representative Beverly Kanawi is a resident of Ocean Side,

23  California.

24      13.      Plaintiff and Class Representative Salvador Aquino is a resident of Union City,

25  California.

26      14.      Each Plaintiff and Class Representative is a former Bechtel employee.

27      15.      Each Plaintiff and Class Representative is a participant in the Plan.

28                                      **Defendants**

                                            3

1    16.    Defendant Bechtel Corporation is a privately-held California corporation with its

2  headquarters in San Francisco, California and at least forty offices and facilities located

3  throughout the United States and around the world.

4    17.    Bechtel Corporation describes itself as "one of the world's premier engineering,

5  construction, and project management companies," with revenues of more than $18 billion in

6  2005.  Bechtel is currently involved in Boston's "Big Dig" highway reconstruction project.

7  According to its website, "Bechtel has completed more than 22,000 projects in 140 countries,

8  including Hoover Dam, the Channel Tunnel, Hong Kong International Airport, the San Francisco

9  Bay Area Rapid Transit (BART) system, the reconstruction of Kuwait's oil fields after the Gulf

10  War, Jubail industrial city, and the Alma aluminum smelter." Bechtel provides engineering,

11  construction, and project management in areas including roads and rail systems, airports and

12  seaports, fossil and nuclear power plants, refineries and petrochemical facilities, mines and

13  smelters, defense and aerospace facilities, environmental cleanup projects, telecommunications

14  networks, pipelines and oil and gas field development.

15    18.    Bechtel is the Sponsor of the Plan pursuant to ERISA § 3(16)(B).

16    19.    Defendant Peggi Knox is the principal Vice President of Retirement Plans of

17  Bechtel Corporation and the individual designated by Bechtel to sign documents on behalf of

18  Bechtel as Plan Sponsor.

19    20.    Defendant Bechtel Trust & Thrift Plan Committee (the "Committee") is the

20  named fiduciary and Administrator of the Plan.  Bechtel Corporation appoints the Committee.

21  The Committee is comprised of Bechtel officers and employees.

22    21.    Defendant Pat Damsgaard is an officer and employee of Bechtel and the

23  individual designated by Bechtel to sign documents as Plan Administrator.

24    **Jurisdiction and Venue:**

25    22.    **JURISDICTION:**  Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) &

26  (3), 29 U.S.C. §§ 1132(a)(2) & (3), which provides that participants may pursue civil actions on

27  behalf of the Plan to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C.

28  § 1109,  and to obtain other appropriate equitable relief.  This Court has federal question subject

4

1 | matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

2 |     23.    All Defendants are subject to service of process issued from this Court pursuant to

3 | 29 U.S.C . §§ 1132(e)(1)(2).

4 |     24.    Venue is proper in this Court pursuant to 29 U.S.C. § 1132 (e)(2) because the Plan

5 | is administered in this district, the breaches of fiduciary duty giving rise to this action occurred in

6 | this district, and the Defendants may be found in this district.

7 |     25.    **INTRADISTRICT ASSIGNMENT:** Venue is proper in this division of this

8 | Court pursuant to Local Rules 3-2(c) and (d) in that a substantial part of Defendants' actions and

9 | omissions out of which this action arises occurred in San Francisco County, California.

10 | **Rule 23 Requires Class Certification:**

11 |     26.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil

12 | Procedure, on behalf of themselves and all similarly situated Plan participants and beneficiaries.

13 | They seek to represent the following class (the "Class"):

14 |         All persons, *excluding the Defendants and other individuals who are or*

15 |         *may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the Plan and who are, were, or may have

16 |         been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

17 |     27.    Certification of this Class is proper under Rule 23(a) in that:

18 |     A. **Numerosity.** The members of the Class are so numerous that joinder of all

19 |         members is impracticable. Although the Plaintiffs do not know the exact

20 |         number of Class members as of the date of filing, the Plan's public documents

21 |         state that, at the end of the 2004 Plan year, there were 16,563 participants with

22 |         account balances in the Plan.

23 |     B. **Commonality.** Common issues of fact and law predominate over any issues

24 |         unique to individual Class members. Issues that are common to all Class

25 |         Members include, but are not limited to, whether the Defendants:

26 |         i.    Charged fees and expenses to the Plan that are unreasonable or not

27 |             incurred solely for the benefit of Plan participants;

28 |

5

ii.   Caused the Plan to enter into agreements with third-parties that caused or allowed the Plan to pay fees and expenses that were, or are unreasonable or not incurred solely for the benefit of Plan participants;

iii.   Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused or allowed the Plan to pay fees and expenses that are unreasonable or not incurred solely for the benefit of Plan participants;

iv.   Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial, and retirement industry collect payments and other revenues from 401(k) plans;

v.   Failed to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

vi.   Failed to inform properly, and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

vii.   Failed to inform, or disclose to, Plan participants in proper detail and clarity the transaction fees and expenses that affect participants' account balances in connection with the purchase or sale of interests in investment alternatives;

viii.   Breached their fiduciary duties by failing to disclose that hidden and excessive fees were and are being assessed against Plan assets and by failing to stop such hidden excessive fees;

ix.   In charging, causing to be charged or paid, and failing to monitor the fees and expenses of the Plan, failed to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters;

6

x.   Caused or allowed fees and expenses to be paid by the Plan for
purposes other than those allowed by ERISA;

xi.   By the conduct above or by other conduct set forth in this
Complaint, revealed in discovery, or proven at trial, breached their
fiduciary and other ERISA-imposed obligations to the Plan, Plan
participants and beneficiaries, and members of the Class;

xii.   Are liable to the Plan and the Class for losses suffered as a result
of the breaches of their breached their fiduciary duties and other
ERISA-imposed obligations; and

xiii.   Are responsible to account for the assets and transactions of the
Plan and should be charged for any transactions and payments for
which they cannot account.

C.   **Typicality.** The claims brought by the Plaintiffs are typical of those of the
absent Class members, in that:

i.   The Defendants owed the exact same fiduciary and other ERISA-
based obligations to each Plan participant and beneficiary and each
member of the Class;

ii.   The Defendants' breach of those obligations constitutes a breach to
each participant and beneficiary and each member of the Class;

iii.   To the extent that there are any differences in Class members'
damages, such differences would be a product of simple
mathematics based upon account balances in the Plan. Such
minimal and formulaic differences are no impediment to class
certification.

D.   **Adequacy of Representation.** The Plaintiffs are adequate representatives of
the absent Class members and will protect such absent Class members'
interests in this litigation. The Plaintiffs do not have any interests antagonistic
to the other class members nor do they have any unique claims or defenses

7

that might undermine the efficient resolution of the Class' claims.  Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

28.     Class certification is also appropriate under Rule 23(b) and each subpart in that:

    A.  Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

    B.  Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

    C.  Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS APPLICABLE TO ALL COUNTS

### The Plan

29.     As part of their compensation and benefits, Bechtel offers certain of its employees the opportunity to participate in the Plan.  The Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contains or is part of an "eligible individual account plan" under ERISA § 407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A).  It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

30.     Bechtel benefits by providing the Plan to eligible employees in that the opportunity to participate enhances Bechtel's ability to recruit and retain qualified personnel, fosters employee loyalty and goodwill, and entitles Bechtel to tax advantages under the Internal Revenue Code.

31.     The Plan was established by the Trust and Thrift Plan Document, which was restated as of January 1, 2003 (the "Plan Document").  The Plan operates in connection with a master trust.

32.     A "master trust" is a separate trust entity established by an employer or group of related employers to provide investment and administrative services to a 401(k) plan or plans. Plan sponsors and administrators generally utilize master trusts to administer multiple 401(k)

8

1 plans for an employer or related-employer group (*e.g.* a company or related companies that

2 maintain salaried and hourly employee plans; plans formerly sponsored or administered by a

3 company that the employer has acquired and/or with whom the employer has merged; plans that

4 include only employees of a bargaining unit or who are represented by a labor organization, etc.).

5       33.     Through a master trust structure, several 401(k) plans may invest in common

6 investment options or funds offered in the master trust and may share the services of master trust

7 record-keepers, investment managers, consultants, and other service providers. The fees incurred

8 for such services typically are allocated among participating plans based upon each plan's

9 proportionate share of the assets in the master trust.

10       34.     Bechtel has designed the Plan, combined with the Becon Trust and Thrift Plan

11 (the "Becon Plan"), to be administered through a master trust pursuant to a Master Trust

12 Agreement effective July 1, 1985, between Bechtel Power Corporation and Bankers Trust

13 Company, and, as of August 1, 2003, between Bechtel Corporation and State Street Bank and

14 Trust Company (the "Master Trust").

15       35.     The Master Trust Agreement is part of, and incorporated into, the Plan Document.

16       36.     The Plan's assets comprise approximately 99.97% of the assets in the Master

17 Trust. The Becon Plan's assets, approximately, comprise the remaining .03%.

18       37.     Deutsche Bank Trust Company of America ("Deutsche") was the trustee of the

19 Master Trust prior to August 1, 2003. State Street Bank & Trust Company ("State Street") is the

20 Trustee of the Master Trust and has been since August 1, 2003.

21       38.     According to the Plan's financial statements filed with the Department of Labor,

22 each year highly compensated participants may contribute up to 15 percent and non-highly

23 compensated employees may contribute up to 40 percent of their annual compensation, as defined

24 in the Plan. Participants may also contribute amounts representing distributions from other

25 qualified defined benefit or contribution plans. Participants will be eligible for contributions from

26 the Company in the first full payroll period following their completion of one year of service.

27 Bechtel will match an amount equal to 25 percent of the first 5 percent of the compensation that

28

9

1 certain participants contribute to the Plan.  Additional amounts may be contributed at the option

2 of the Board of Directors of Bechtel Corporation, including profit sharing contributions.

3      39.     According to the Summary Plan Description (the "SPD") and the Plan Document,

4 Plan participants are 100 percent vested in their account at all times, including Bechtel's matching

5 and discretionary contribution portion; thus amounts are entirely non-forfeitable.

6      40.     According to the SPD and the Plan Document, each participant's account is

7 credited with the participant's contributions, the participant's share of the Companies' matching

8 and discretionary contributions, and, of course, earnings on the participant's investments.

9      41.     According to the Plan's financial statements filed with the Department of Labor

10 and materials sent to participants, upon enrollment in the Plan, participants may direct their

11 contributions in one or more of the following investment fund options: Conservative Asset

12 Allocation Portfolio, Moderate Asset Allocation Portfolio, Aggressive Asset Allocation Portfolio,

13 Stable Value Fund, Money Market Fund, Bond Fund, S&P 500 Index Fund, U.S. Large Cap

14 Value Fund, U.S. Large Cap Growth Fund, U.S. Small Cap Core Fund and the International

15 Equity Fund.

16      42.     According to the Plan's financial statements filed with the Department of Labor

17 and the SPD, *net* investment income for each Fund, as earned, together with realized and

18 unrealized gains and losses, are allocated daily to participants, based on their account balances,

19 and reinvested.

20      43.     According to the SPD and the Plan Documents, upon termination, retirement,

21 death or disability, the participant or beneficiary may elect to receive a single-sum amount equal

22 to the value of funds allocated to the participant's account, or to rollover the account balance to an

23 Individual Retirement Account or another qualified retirement plan.

24      44.     According to the Plan Document, expenses of the Plan are paid by Bechtel

25 Corporation, the Plan, and the Master Trust.

26      45.     Pursuant to § 6.01 of the Plan Document, the Committee is the Administrator and

27 named fiduciary of the Plan as defined in ERISA §402(a)(1).   The Plan Document delegates to

28 the Committee a broad array of powers:

10

6.02    POWERS OF THE COMMITTEE.  The Committee shall exercise all discretionary authority under the Plan except to the extent that such authority is delegated to another fiduciary.  The Committee shall have the power and the duty to take all actions and to make all decisions necessary or proper to carry out its responsibilities under the Plan.  All determinations of the Committee as to any question involving its responsibilities under the Plan, including, without limitation, interpretation of the Plan, or as to any discretionary items to be taken under the Plan, shall be solely at the discretion of the Committee and shall be final, conclusive and binding on all persons claiming to have any right or interest in or under the Plan.

The Committee's powers and duties include, but are not limited to, full discretionary authority to do the following:

(a)    to determine the rights of eligibility of an Employee to participate in the Plan, and the value of a Participant's Account Balance;

(b)    to adopt rules of administration necessary for the proper and efficient administration of the Plan;

(c)    to construe and enforce the terms of the Plan and the rules of administration it adopts, including interpretation of the Plan documents and documents related to the Plan's operation;

(d)    to direct the Trustee with respect to the crediting and charging of the Trust Fund;

(e)    to review and render decisions with respect to a claim for (or denial of a claim for) a benefit under the Plan;

(f)    to furnish the Employers with information which the Employers may require for tax or other purposes;

(g)    to engage the services of agents whom it may deem advisable to assist it with the performance of its duties;

(h)    to select, engage, evaluate and terminate the services of an "investment manager" or managers (as defined in ERISA § 3(38)), each of whom will have full power and authority to manage, acquire or dispose (or direct the Trustee with respect to acquisition or disposition) of any Plan asset under its control in accordance with an agreement entered into with the Committee;

(i)    to provide for the payment of all expenses which are incurred in connection with the administration of the Plan and the investment of the Trust Fund from the Trust Fund to the full extent permitted by applicable law and in accordance with the Plan;

(j)    to appoint such committees with such powers and duties as it shall determine and other administrative personnel to act on behalf of the Committee;

(k)    to correct errors to the extent feasible;

(l)    to determine the number and category of investment funds that will

11

be offered under the Plan and to add and delete investment funds; and

(m)     to take such other action as is appropriate in connection with administration of the Plan.

Any appointment pursuant to section 6.02(j) will carry with it the full discretionary authority of the Committee with respect to the delegated powers and duties unless the Committee provides to the contrary.

46.     In the Plan Document, Bechtel Corporation agrees to indemnify the Committee and certain Plan fiduciaries:

6.05     INDEMNITY OF CERTAIN FIDUCIARIES.  The Employers shall indemnify and hold harmless the members of the Committee and any Employees who may be deemed fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), from and against any and all liabilities, claims, demands, costs and expenses, including attorney's fees, arising out of an alleged breach in the performance of their fiduciary duties under the Plan and under ERISA, other than such liabilities, claims, demands, costs and expenses as may result from the gross negligence or willful misconduct of such persons.  The Employers shall have the right, but not the obligation, to conduct the defense of such persons in any proceeding to which this Section applies.  The Employers may satisfy their obligations under this Section, in whole or in part, through the purchase of a policy or policies of insurance providing equivalent protection.

47.     On March 24, 2005, Bechtel amended the Plan Document effective "as of January 1, 2005:"

3.     Payment of Administrative Costs

(a)     To clarify that the Plan will not pay expenses incurred in administering the Plan that constitute payments for "settlor" functions, and that the Administrator is charted with responsibility for determining whether or not an expense is payable by the Plan, a new Section 6.17 is inserted, as follows:

6.17     ADMINISTRATIVE EXPENSES.  Except as otherwise provided in the Plan, all expenses reasonably and actually incurred in the administration of the Plan by the Company, the Committee, its delegates or others, including legal, Trustee and investment management fees and expenses and costs of services provided by Employees or third parties ("Administrative Expenses"), shall be payable from the Trust Fund, except to the extent paid by the Employers under paragraph (b) below.

(a)     The Committee (in its discretion) shall determine which Administrative Expenses are not payable for the Trust Fund under the foregoing rules.

(b)     The Company (in its discretion) may direct the Employers to pay any or all Administrative Expenses.

(c)     Notwithstanding the foregoing, Administrative Expenses shall be paid from the Trust Fund only to the extent such payments (to the extent prohibited by section 406) are exempt under section 408 of ERISA.

12

**Defendants' Fiduciary Duties To The Plan Under ERISA**

48.     ERISA §403(c)(1), 29 U.S.C. §1103(c)(1), unambiguously mandates that:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be

held for the **exclusive purposes of providing benefits** to participants in the plan

and their beneficiaries **and defraying reasonable expenses of administering the**

**plan.**

(Emphasis added).

49.     ERISA §§ 404(a)(1)(A)&(B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), require that Plan

fiduciaries, including Defendants, "shall discharge [their] duties with respect to a plan solely in

the interest of the participants and beneficiaries" and:

A.     [F]or the exclusive purpose of:

i.     providing benefits to participants and their beneficiaries; and

ii.    defraying reasonable expenses of administering the plan; and

B.     [W]ith the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like

aims.

50.     ERISA § 406, 29 U.S.C. § 1106, prohibits certain transactions between the Plan

and "parties in interest." Unless subject to an exemption set forth in ERISA § 408, 29 U.S.C.

§ 1108, a fiduciary

shall not cause the plan to engage in a transaction …if he knows or should know
that such a transaction constitutes a direct or indirect – sale or exchange, or
leasing, of any property between the plan and a party in interest …furnishing of
goods, services or facilities between the plan and a party in interest …transfer to,
or use by or for the benefit of, a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1).

51.     For purposes of section 406, a "party in interest" is any plan fiduciary, including

the plan administrator, trustee, officer or custodian, any plan services provider, the employer, a

13

1 relative of any of the above, and certain persons with ownership or leadership roles in any of the

2 above.  ERISA § 3(14), 29 U.S.C. § 1002(14).

3     52.     Similarly, a fiduciary (1) shall not "deal with the assets of the plan in his own

4 interest or for his own account;" (2) shall not "act in any transaction involving the plan on behalf

5 of a party (or represent a party) whose interests are adverse to the interests of the plan" or its

6 participants and beneficiaries; and (3) shall not "receive any consideration for his own personal

7 account from any party dealing with such plan in connection with a transaction involving the

8 assets of the plan."  29 U.S.C. § 1106(b).

9     53.     ERISA § 104(b)(1), 29 U.S.C. § 1024(b)(1), requires that the Plan Administrator

10 periodically provide to Plan participants and beneficiaries a Summary Plan Description.

11    54.     ERISA § 104(b)(3), 29 U.S.C. § 1024(b)(3), requires that the Plan Administrator

12 at least annually provide to Plan participants and beneficiaries copies of statements and schedules

13 from the Plan's annual report for the previous year, and such additional information "as is

14 necessary to fairly summarize the latest annual report."

15    55.     The schedules and statements that the Plan Administrator annually must provide

16 to Plan participants and beneficiaries specifically include:

17         A. [A] statement of the assets and liabilities of the plan aggregated by categories

18            and valued at their current value, and the same data displayed in comparative form

19            for the end of the previous fiscal year of the plan; and

20         B. [A] statement of receipts and disbursements during the preceding twelve-

21            month period aggregated by general sources and applications.

22         ERISA § 103(b)(3), 29 U.S.C. § 1023(b)(3).

23    56.     ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), entitles Plan participants and

24 beneficiaries to receive more detailed information from the Plan Administrator on request:

25         The administrator shall, upon written request of any participant or beneficiary,

26         furnish a copy of the latest updated summary, plan description, and the latest

27         annual report, any terminal report, the bargaining agreement, trust agreement,

28         contract, or other instruments under which the plan is established or operated.

14

57.     ERISA § 103(b)(2)&(3), 29 U.S.C. § 1023(b)(2)&(3) mandates that, among other extensive disclosures, Plan fiduciaries must include in the Plan's "Annual Report":

> a statement of [the Plan's] assets and liabilities, and a statement of changes in net assets available for plan benefits which shall include details of revenues and expenses and other changes aggregated by general source and application.

58.     ERISA § 404(c), 29 U.S.C. § 1104(c) provides to Plan fiduciaries a "safe harbor" from liability for losses that a participant suffers in his or her 401(k) account to the extent that the participant exercises control over the assets in his or her 401(K) accounts.  To be eligible for the protection of this "safe harbor," Plan fiduciaries must, among other things, provide:

> A.     "an opportunity for a participant or beneficiary to exercise control over assets in his individual account," and
>
> B.     "a participant or beneficiary with an opportunity to choose, from a broad range of investment alternatives, the manner in which some or all of the assets in his account are invested.

29 C.F.R. § 2550.404c-1(b)(1).

59.     For a participant or beneficiary to have "an opportunity to exercise control over assets in his individual account," Plan fiduciaries must provide him or her with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the [P]lan." 29 C.F.R. § 2550.404c-1(b)(2)(i)*(B)*.

60.     The "sufficient investment information" Plan fiduciaries must provide includes:

> A.     "A description of any transaction fees and expenses which affect the participant's or beneficiary's account balance in connection with purchases or sales of interests in investment alternatives (e.g., commissions, sales load, deferred sales charges, redemption or exchange fees)." 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)*(1)(v)* and
>
> B.     At least upon request, "[a] description of the annual operating expenses of each designated investment alternative (e.g., investment management fees, administrative fees, transaction costs) which reduce the rate of return to

15

1                  participants and beneficiaries, and the aggregate amount of such expenses

2                  expressed as a percentage of average net assets of the designated investment

3                  alternative." 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)*(2)(i)*.

4        61.      ERISA's Safe Harbor Regulations state that the imposition of *reasonable* charges

5 for *reasonable* Plan expenses does not interfere with a participant's opportunity to exercise

6 control over his or her individual account so long as *Plan fiduciaries inform the participant* of

7 such actual expenses:

8                  A plan may charge participants' and beneficiaries' accounts for the reasonable

9                  expenses of carrying out investment instructions, *provided that procedures are*

10                  *established under the plan to periodically inform such participants and*

11                  *beneficiaries of actual expenses incurred with respect to their respective*

12                  *individual accounts.*

13     29 C.F.R. § 2550.404c-1(b)(2)(ii)(A) (emphasis added).

14                 **The Fees and Expenses Assessed Against The Plan**

15        62.      Either directly or through the Master Trust, Defendants have caused the Plan to

16 purchase trustee, record-keeping, administration, investment advisory, investment management,

17 brokerage, insurance, consulting, accounting, legal, printing, mailing, and other services from

18 various institutions and entities.

19        63.      Either directly or through the Master Trust, Defendants have caused the amounts

20 that the Plan pays for these services to be assessed against participants' accounts.

21        64.      Either directly or through the Master Trust, Defendants have caused or allowed

22 these services providers to receive payment in at least one of two ways:

23                  A. By direct disbursement from the Plan to the entity providing the service; or

24                  B. By receiving, or having the opportunity to receive, "Revenue Sharing"

25                  payments comprised of Plan assets distributed between or among various service

26                  providers.

27                **"Hard Dollar" Payments to Plan Service Providers**

28

SECOND AMENDED COMPLAINT
CASE NO. C 06-05566 CRB

65.     Payments in the form of direct disbursements from the Plan to participants or an entity providing a service to the Plan are characterized as "Hard Dollar" payments.

66.     The Plan discloses to government regulators and Plan participants, in one form or another, Hard Dollar payments made from the Plan to service providers. For example, the Plan disclosed in filings with the Department of Labor that it paid $33,257 to JP Morgan Retirement Plan Services, the Plan record-keeper, in 2004.

67.     Based upon this disclosure, understanding the Plan's record-keeping expense for 2004 *appears* straightforward: The Plan sent a check for $33,257 to JP Morgan Retirement Plan Services and, in exchange, it maintained the Plans' records.

### "Hard Dollar" Expenses and Master Trusts

68.     When a plan, such as Bechtel's, is administered through a master trust, the disclosure of Hard Dollar payments for services provided to the 401(k) plan may become incomplete, unclear, and inaccurate.

69.     These shortcomings arise when the Hard Dollar payments to *Plan* service providers are made *from the Master Trust* and reported to government regulators *only in connection with the Master Trust.*

70.     In such circumstances, the *Plan's* disclosures to government regulators and Plan participants do not include the Hard Dollar payments made to Plan service providers *from the Master Trust.* Those payments to Plan service providers – because they are disbursed *from the Master Trust* – are reported in the Master Trust's disclosures to government regulators. Details of such payments from the Master Trust are not routinely disclosed to Plan participants.

71.     As a result, it may appear to Plan participants and government regulators that Hard Dollar payments made by the Plan to service providers in a given year were very small – or that the Plan did not incur such expenses at all.

72.     But, in actuality, millions of dollars in *Plan* Hard Dollar payments *to Plan service providers* may have been disbursed *from the Master Trust.*

17

73.   Even though such Hard Dollar payments are disbursed from the Master Trust, the Plan and its participants still pay them: The Master Trust assesses the amount of these Hard Dollar payments against the Plan's assets held in the Master Trust.

74.   The Plan's financial statements filed with government regulators make this clear:

> At December 31, 2004 and 2003, the Plan's interest in the net assets of the Master Trust was approximately 99.97 percent. **Net investment income and administrative expenses relating to the Master Trust are allocated to the individual plans based upon individual plan participant account balances.**
> (Emphasis Added).

75.   For example, in 2004, Bechtel or the Committee reported to Plan participants in the Plan's 2004 Summary Annual Report, and to government regulators that the Plan incurred only $33,257 in record keeping expenses and no other administrative expenses.

76.   Thereafter, Defendant Knox extolled the great savings -$5.9 million - that changes in the Plan and Plan service providers had achieved for Plan participants.

77.   However, in actuality, Bechtel and the Committee had changed the accounting of the Plan's administrative and investment management expenses from the Plan level to the Master Trust level. The result was that Plan expenses had *increased by more than $2 million and* were not disclosed to participants and government regulators specifically in connection with the Plan, even though the Plan still had to pay them.

78.   Thus, Defendants' claim of savings to Plan participants was affirmatively misleading and deceptive.

79.   The Defendants' conduct in disbursing Hard Dollar payments for Plan services from the Master Trust in this or a similar manner, makes it difficult, and sometimes impossible, for Plan participants to discern the amount of Hard Dollar payments the Plan is making to Plan service providers; to whom those payments are made; and the services provided in exchange for those payments.

80.   Further, as Defendants' conduct demonstrates, manipulating the reporting of Plan expenses between the Plan and Master Trust level has enabled the Defendants to both:

A.   conceal the fact that Plan fees and expense substantially increased for no apparent reason and with no commensurate benefit to participants; and

18

1            B.     falsely suggest that Plan fees and expenses had decreased by millions of

2            dollars as a result of the Defendants' efforts.

3         **Revenue Sharing Payments to Plan Service Providers**

4       81.     Revenue Sharing is a common practice in the financial, securities, and investment

5  industry that provides services to 401(k) plans.

6       82.     Industry commentators and analysts consider Revenue Sharing as the "big secret

7  of the retirement industry."

8       83.     Industry commentators and analysts generally define Revenue Sharing as the

9  transfer of asset-based compensation from brokers or investment management providers (such as

10  mutual funds, common collective trusts, insurance companies offering general insurance

11  contracts, and similar pooled investment vehicles) to administrative service providers (record-

12  keepers, administrators, trustees, consultants) in connection with 401(k) and other types of

13  defined contribution plans.  Such transfers may consist of monetary payments and/or non-

14  monetary benefits such as a credit for services, equipment, educational materials, conferences and

15  seminars at resorts and hotels, or the like.

16       84.     For example, a plan or its agent (a third-party administrator, consultant, or similar

17  fiduciary) seeking to invest plan assets in an investment vehicle (a mutual fund, common and

18  collective trust, guaranteed investment contract, etc. (collectively a "Fund")) will negotiate an

19  agreement that sets the costs to be assessed against each dollar invested by specifying the Fund's

20  expense ratio and revenue sharing that the Fund will make available.

21       85.     In Revenue Sharing arrangements, the Plan and the Fund agree upon an asset-

22  based fee that is *not* the true price for which the Fund will provide its service.

23       86.     Instead, in Revenue Sharing arrangements the Fund's agreed asset-based fee

24  includes ***both*** the actual price for which the Fund will provide its service ***and*** additional amounts

25  that the Fund does not need to cover the cost of its services and to make a profit.

26       87.     The additional portion of the agreed-upon asset-based charge is "shared" with

27  Plan service providers or others who do business with the Plan or the Fund.

28

19

88.     As a result of Revenue Sharing arrangements, Plan service providers or others who do business with the Plan or the Fund may receive *both* a Hard Dollar payment from the Plan *and* additional revenue that the Fund "shares" with them.

89.     The total fees a Fund charges to a Plan can vary widely based upon a number of factors, including without limitation:  the amount that the Plan invests in the Fund; the level of sophistication of the Plan fiduciary negotiating the fee agreement; the Plan fiduciary's awareness of  Revenue Sharing and inclination to expend effort monitoring Revenue Sharing transfers; the diligence with which the Plan fiduciary conducts such negotiations; and the separate financial interests or agendas of the Plan fiduciary and the Fund as they negotiate.

90.     Revenue Sharing is not confined to mutual funds.  Common collective trusts, providers of guaranteed insurance contracts, and private investment pools may enter into Revenue Sharing arrangements in connection with the services they provide to 401(k) plans.

91.     Revenue Sharing also occurs between and among brokerage firms, investment managers, fund families, and other service providers.

92.     When Plan service providers receive compensation in the form of both Hard Dollar fees *and* Revenue Sharing payments, determining the total amount of fees and expenses that the Plan incurs for any category of services (*i.e.* recordkeeping and administration, investment management, trustee, auditing, and accounting, etc.) requires that *both* the Hard Dollar fees *and* Revenue Sharing payments be taken into account.

93.     Ascertaining whether the Plan Administrator has fulfilled its fiduciary obligation to ensure that the fees and expenses assessed against the Plan are reasonable and incurred solely in the interest of Plan participants requires consideration of the *total of both* the Hard Dollar *and* Revenue Sharing payments paid (or available) for any category of services.

94.     Although Revenue Sharing monies arise only as a result of, and in connection with, transactions involving the Plan, Plan assets, and Plan service providers,    Revenue Sharing is not always captured and used for the benefit of the Plan and its participants.

95.     When Revenue Sharing is foregone, the Plan will be forced not only to pay additional Hard Dollar fees to the Plan service providers (since no Revenue Sharing payments are

1 used to offset those Hard Dollar costs), but the Plan will also pay additional money to the Fund,
2 beyond what the Fund would normally keep (because the Fund's expense ratio includes both the
3 actual price of the Fund's services *and* Revenue Sharing amounts).

4     96.    Consequently, in determining whether the Plan Administrator or other fiduciary
5 has fulfilled its obligation to ensure that the fees and expenses assessed against the Plan are
6 reasonable and incurred solely in the interest of Plan participants, foregone Revenue Sharing must
7 also be taken into account.

8     97.    Such is the case in the Bechtel Thrift and Trust Plan. The Plan's investment
9 options, including mutual funds and certain of the collective trusts, charged fees to the Plan (as
10 part of the investment options' expense ratios) that included amounts with which to make
11 Revenue Sharing payments. However, the available Revenue Sharing was not captured and used
12 solely in the interest of the Plan and its participants and beneficiaries.

13     98.    As a result, when such foregone Revenue Sharing – consisting of millions of
14 dollars – is taken into account, the participants and beneficiaries of the Plan paid unreasonably
15 high fees for the administrative services and/or investment management they received.

16     99.    In addition to obscuring the reporting of, and making affirmatively misleading
17 statements ignoring, the more then $2.5 million increase in the administrative fees borne by Plan
18 participants in 2004, the Defendants failed to disclose and explain to Plan participants why they
19 assessed more than $1.3 million in legal and consulting fees against Plan participants' retirement
20 savings in 2003 and 2004.

21     100.    In the same time frame that Defendants incurred these seven-figure professional
22 fees, Defendants were making substantial alterations to the *design* of the plan – a settlor function
23 for which ERISA prohibits the assessment of expenses against the Plan.

24     101.    After completing these Plan design alterations and paying out this $1.3 million in
25 Plan assets, on March 24, 2005, Defendants amended the Plan Document to "clarify" that the Plan
26 should "not pay expenses incurred in administering the Plan that constitute payments for 'settlor
27 functions.'" *See* ¶47, above.

28

SECOND AMENDED COMPLAINT
CASE NO. C 06-05566 CRB

1    102.    Based on the foregoing, Plaintiffs are informed and believe that the Defendants

2 caused the more than $1 million in settlor expenses to be assessed against participants' retirement

3 savings in violation of ERISA.

4    **Revenue Sharing Arrangements Are Not Disclosed to Plan Participants**

5    103.    Revenue Sharing is not disclosed to Plan participants and government regulators,

6 even though it may account for a greater portion of certain categories of service provider

7 payments than do Hard Dollar disbursements to those same providers.

8    104.    Accordingly, industry commentators and experts have dubbed Revenue Sharing

9 payments to be "hidden fees" that are assessed against 401(k) plans and thus reduce plan

10 participants' retirement savings.

11    105.    By entering into, allowing, and/or failing to monitor, discover, and prevent or

12 recover these undisclosed Revenue Sharing arrangements, Defendants have and continue to

13 deprive Plan participants of true and accurate information regarding:

14        A.    How much they are paying in fees and expenses for the Plan;

15        B.    Who is receiving Plan assets through Revenue Sharing;

16        C.    How much service providers are paid in addition to their disclosed, Hard

17        Dollar fees; and

18        D.    Whether the total amount paid to services providers (*i.e.* disclosed, Hard

19        Dollar fees *combined with* Revenue Sharing) is reasonable and incurred solely for

20        participants' benefit.

21    **Defendants' Non-Compliance with § 404(c)'s Safe Harbor Requirements**
**and Concealment of Fiduciary Breaches**

22

23    106.    As set forth above, the Defendants did not disclose, and to this day have not

disclosed, the fact that Plan service providers were engaging in Revenue Sharing, or that Revenue

24 Sharing was available for the benefit of the Plan and its participants, or the amount of Revenue

25 Sharing payments made by or to Plan service providers.

26    107.    Plan participants did not have, and do not have, complete and actual knowledge of

27 the fees and expenses being charged to the Plan that reduce their account balances.

28

SECOND AMENDED COMPLAINT
CASE NO. C 06-05566 CRB

108.    Plan fiduciaries, including the Defendants, have not told Plan participants, and Plan participants do not know:

> A.    the "annual operating expenses" of the investment options in the Plan, as required by 29 C.F.R. §2550.404c-1(b)(2)(i)(B)*(2)(i)*; and
>
> B.    the actual expenses incurred with respect to their respective individual accounts, as required by 29 C.F.R. §2550.404c-1(b)(2)(ii)(A).

109.    As a result of the Defendants' failure and refusal to provide such information -- and the general failure on the part of the Plan fiduciaries to disclose the actual Plan expenses, including available revenue sharing -- Plan participants have not been provided with "the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan." 29 C.F.R. §2550.404c-1(b)(2)(B).

110.    Because the Defendants failed and refused to provide them with this information, and concealed this information from them, the participants have lacked the information necessary to understand and protect their interests in the Plan or to have knowledge of the Defendants' breaches of fiduciary duty.

111.    In fact, in their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated.

112.    Defendants have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan.

113.    Defendants' silence and/or non-disclosure in the face of such a duty to disclose is equivalent to an affirmative misrepresentation.

114.    Here, despite the Defendants' duty to disclose full and accurate information regarding the fees and expenses assessed against participants' accounts, on an ongoing basis Defendants failed and refused to disclose to, and inform the participants of:

> a.    the amount of fees and expenses reasonable and necessary to operate the Plan;

23

b.     the total amount of amount of fees and expenses the Plan actually paid to service providers in the form of Hard Dollar payments and Revenue Sharing;

c.     the availability of Revenue Sharing;

d.     the true and accurate details regarding the fees and expenses of the Plan;

e.     the true and accurate operating expenses that reduce participants' returns, including both Hard Dollar payments and Revenue Sharing, for each of the Plan's investment alternatives;

f.     the true and accurate transaction fees and expenses that affect the participants' account in connection with the purchase or sale of investment alternatives;

g.     the amount, when both Hard Dollar Payments and Revenue Sharing are considered, by which the Plan's expenses exceeded those which were reasonable and incurred solely in participants' interests; and

h.     other revenue and expense information necessary for the participants to understand and protect their interests in the Plan.

115.    Based upon the foregoing, Defendants are not entitled to the safe harbor protections of ERISA § 404 (c).

116.    Based upon the foregoing, the statue of limitations was tolled on the breaches set forth in this Complaint and did not begin to run until such time as Plaintiffs actually discovered them.

**COUNT I:**
**[Breach of Fiduciary Duty – ERISA §502(a)(2)]**

117.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 116 as though fully set forth here.

118.    As set forth in detail above, Defendants owe to the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

A.  To conduct itself as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent

24

1   ERISA professional fiduciary would in operating and administering a 401(k)

2   plan the size and character of the Plan;

3   B.   To perform its duties as Plan Sponsor and Administrator with the utmost

4   loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding

5   at all times conflicts of interest, self-interest, and duplicity;

6   C.   To ensure, at all times, that Plan assets "shall never inure to the benefit of any

7   employer and shall be held for the exclusive purposes of providing benefits to

8   participants in the Plan and their beneficiaries and defraying reasonable

9   expenses of administering the Plan;"

10   D.   To track and account for all transactions involving the Plan and Plan assets so

11   as to ensure that Plan assets are retained, managed, and disbursed in

12   compliance with the Plan Document and ERISA;

13   E.   To track and account for all transactions involving the Plan and Plan assets so

14   as to ensure that Plan assets "never inure to the benefit of any employer and

15   shall be held for the exclusive purposes of providing benefits to participants in

16   the Plan and their beneficiaries and defraying reasonable expenses of

17   administering the Plan;"

18   F.   To ensure that the fees and expenses incurred by the Plan are reasonable and

19   incurred for the sole and exclusive benefit of Plan participants and

20   beneficiaries;

21   G.   In entering into agreements with service providers to the Plan, to ensure that

22   the payments from the Plan, whether they are direct or indirect, are reasonable

23   for the services provided and made for the sole and exclusive benefit of Plan

24   participants and beneficiaries;

25   H.   In operating and administering the Plan, to establish, implement, and follow

26   procedures to properly and prudently determine whether the fees and expenses

27   paid by the Plan were reasonable and incurred solely for the benefit of Plan

28   participants;

25

I.  In operating and administering the Plan, on an ongoing basis to monitor the payments made by the Plan to service providers, whether they are direct or indirect, are and remain reasonable for the services provided and made for the sole and exclusive benefit of Plan participants and beneficiaries;

J.  To inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

K.  To inform itself of trends, developments, practices, and policies in the retirement, financial investment, and securities industry that affect the Plan and to remain aware and knowledgeable of such trends, practices, and policies on an ongoing basis;

L.  To communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, and accurately;

M.  To affirmatively and without request provide Plan participants and beneficiaries with honest, accurate, and complete information they need to understand their investments in the Plan; the management, risk, potential returns of such investments; and the fees and expenses incurred in connection with those investments;

N.  Upon request, to provide further information to Plan participants and beneficiaries regarding the operation and administration of the Plan and the expenses incurred in doing so; and

O.  To provide honest, accurate, and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions.

119.  As set forth in detail above, Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries, and the Class by, among other conduct to be proven at trial:

26

A.  Causing the Plan to enter into agreements with service providers under which the Plan pays, directly or indirectly, fees and expenses that are unreasonable or not incurred solely for the benefit of Plan participants and beneficiaries;

B.  Allowing the Plan to pay, directly on indirectly, fees and expenses are unreasonable or not incurred solely for the benefit of Plan participants and beneficiaries;

C.  Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing or allowing the Plan to pay fees and expenses that are unreasonable or not incurred solely for the benefit of Plan participants and beneficiaries;

D.  Failing to inform itself of trends, developments, practices, and policies in the retirement, financial investment, and securities industry that affect the Plan; and failing to remain aware and knowledgeable of such trends, practices, and policies on an ongoing basis;

E.  Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

F.  Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

G.  Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, and accurately;

H.  Failing properly to inform or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

I.  Failing to inform or disclose to Plan participants in proper detail and clarity the transactions, fees, and expenses that affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

J.  Failing to discover, disclose, and stop the charging of hidden and excessive fees to the Plan; and

27

K.  By the foregoing conduct, failing to exercise the care, skill, prudence, and diligence that a prudent person would when acting in like capacity and familiar with such matters.

120.    As set forth in detail above, as a result of these breaches, Plaintiffs, the Class, the Plan, and the Plan's participants and beneficiaries have suffered financial losses and damages.

121.    Further, as set forth in detail above, Defendants failed to provide participants and beneficiaries with sufficient investment information to qualify for the Safe Harbor immunity of ERISA § 404(c), 29 U.S.C. 1104(c). Accordingly, Defendants are liable for participants and beneficiaries' investment losses in the Plan.

122.    Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), 29 U.S.C. §1132(a), Defendants are liable to restore to the Plan the losses it experienced as a direct result of their breaches of fiduciary duty and are liable for any other available and appropriate equitable relief, including prospective injunctive relief and declaratory relief, and attorney's fees.

### COUNT II:
**[Other Remedies for Breach of Fiduciary Duty – ERISA §502(a)(3)]**

123.    Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 122 as though fully set forth here.

124.    In addition to, and as an alternative to, the causes of action stated in Count I, Plaintiffs seek further relief pursuant to ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

125.    Under ERISA § 502(a)(3), a participant may enjoin any act that violates ERISA or may obtain other appropriate equitable relief to redress such violations or enforce the terms of ERISA.

126.    Defendants are the primary fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

127.    Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to

28

1 | participants in the Plan and their beneficiaries and defraying reasonable expenses of administering

2 | the Plan."

3 |      128.        Although *only* Plan participants and beneficiaries are entitled to Plan assets

4 | and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants,

5 | Plan participants and beneficiaries do not know, and have no means of knowing, how their assets

6 | have been managed and disbursed.

7 |      129.        Accordingly, Defendants occupy the position of a common law trustee in

8 | connection with the Plan, its assets, and its participants and beneficiaries.

9 |      130.        As set forth in detail above, Defendants have caused and/or allowed the Plan

10 | to pay, directly or indirectly, excess fees and expenses to Plan service providers.

11 |      131.        Defendants, and not the Plaintiffs, are the entities that have, or should have,

12 | specific and detailed information regarding how Plan assets have been treated and disbursed in

13 | this regard.

14 |      132.        Accordingly, the Court should order that Defendants render an accounting of

15 | all transactions, disbursements, and dispositions occurring in, in connection with, or in respect of,

16 | the Plan and its assets.

17 |      133.        Plaintiffs respectfully request that the Court order that such an accounting

18 | include, without limitation, detailed and specific information regarding all fees and expenses

19 | incurred by the Plan or paid to third parties, whether paid directly by the Plan or the Master Trust

20 | or indirectly transferred among Plan service providers or other third parties.

21 |      134.        Plaintiffs respectfully request that the Court surcharge against the Defendants

22 | and in favor of the Plan all amounts involved in transactions that such accounting reveals were or

23 | are improper, excessive or in violation of ERISA.

24 |      135.        Plaintiffs further seek injunctive and other appropriate equitable relief to

25 | redress the wrongs described above and to cause them to cease in order for the Plan's participants

26 | and beneficiaries to receive the full benefit of their retirement savings in the future.

27 |          WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan

28 | participants and beneficiaries, respectfully request that the Court:

1   • find and declare that the Defendants have breached their fiduciary duties as
2   described above;
3   • order the Defendants to make good to the Plan all losses that the Plan incurred
4   as a result of the conduct described above and to restore the Plan to the position
5   it would have been in but for the breaches of fiduciary duty;
6   • impose a constructive trust on any monies by which the Defendants were
7   unjustly enriched as a result of their breaches of fiduciary duty or cause the
8   Defendants to disgorge such monies and return them to the Plan;
9   • remove the fiduciaries who have breached their fiduciary duties or enjoin them
10  from future breaches of ERISA;
11  • award actual damages to the Plan in the amount of its monetary losses;
12  • require Defendants to render an accounting as set forth above;
13  • surcharge against Defendants, and in favor of the Plan, all amounts involved in
14  transaction that such accounting reveals are improper, excessive or in violation
15  of ERISA;
16  • permanently enjoin Defendants from breaching their fiduciary duties in each
17  respect set forth in the Complaint;
18  • award to the Plaintiffs and the Class their attorneys fees and costs pursuant to
19  ERISA § 502(g);
20  • order costs and attorneys fees pursuant to ERISA § 502(g) and the common
21  fund doctrine;
22  • order equitable restitution or other available equitable relief against the
23  Defendants;
24  • order the payment of interest to the extent it is allowed by law; and
25  • grant any other and further relief the Court deems appropriate.
26
27  **JURY TRIAL DEMANDED**
28  Plaintiffs hereby demand a trial by jury.

30

SECOND AMENDED COMPLAINT
CASE NO. C 06-05566 CRB

1

2  Dated: March 23, 2007                    Respectfully submitted,

3                                           SCHLICHTER, BOGARD & DENTON

4
                                           /s/ Daniel V. Conlisk
5                                          JERRY J. SCHLICHTER (054513)
                                           jschlichter@uselaws.com
6                                          DANIEL V. CONLISK (Pro Hac Vice)
                                           dconlisk@uselaws.com
7                                          HEATHER LEA (Pro Hac Vice)
                                           hlea@uselaws.com
8                                          MARY L. PERRY (175911)
                                           mperry@uselaws.com
9                                          100 South Fourth Street, Suite 900
                                           St. Louis, MO 63102
10                                         Telephone: (314) 621-6115
                                           Facsimile: (314) 621-7151
11
                                           ATTORNEYS FOR PLAINTIFFS Beverly Kanawi;
12                                         and Salvador Aquino as representatives of a class of
                                           similarly situated persons, and on behalf of the Plan
13

14      **CERTIFICATION OF INTERESTED ENTITIES OR PERSON**

15          Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the

16  named parties, there is no such interest to report.

17

18                    /s/  Daniel V. Conlisk

19          I hereby attest that I have on file all holograph signatures for signatures indicated by a

20  "conformed" signature (/s/) within this efiled document.

21                    /s/  Jamie L. Dupree

22

23

24

25

26

27

28
                                    31