SCHLICHTER, BOGARD & DENTON
JEROME J. SCHLICHTER (054513)
DANIEL V. CONLISK (Admitted Pro Hac Vice)
HEATHER LEA (Admitted Pro Hac Vice)
100 South Fourth Street, Suite 900
St. Louis, MO 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-7151
jschlichter@uselaws.com
dconlisk@uselaws.com
hlea@uselaws.com

*Attorneys for Plaintiffs and Class Representatives*

FUTTERMAN & DUPREE LLP
JAMIE L. DUPREE (158105)
160 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
jdupree@dfdlaw.com

*Local Attorneys for Plaintiffs and Class Representatives*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BEVERLY KANAWI and SALVADOR AQUINO, as representatives of a class of similarly situated person, and on behalf of the Plan,<br><br>    *Plaintiffs,*<br><br>    v.<br><br>BECHTEL CORPORATION, THE BECHTEL TRUST AND THRIFT PLAN COMMITTEE, and PEGGI KNOX,<br><br>    *Defendants.* | Case No. C 06-05566 CRB (EDL)<br><br>**STIPULATION AND [PROPOSED] ORDER SUBSTITUTING A CORRECTED EXHIBIT A TO LEA DECLARATION FILED IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE A THIRD AMENDED COMPLAINT**<br><br>Date:      April 4, 2008<br>Time:     10:00 a.m.<br>Courtroom: E, 15th Floor<br><br>The Hon. Charles R. Breyer |

On February 22, 2008, Plaintiffs filed a motion seeking leave to file a Third Amended

Complaint and to add a party ("Plaintiffs' Motion"), which is set to be heard on April 4, 2008;

1

1       In support of Plaintiffs' Motion, Plaintiffs filed the Declaration of Heather Lea, which

2 contained at Exhibit A the proposed Third Amended Complaint which is the subject of Plaintiffs'

3 Motion;

4       Since Plaintiffs filed Plaintiffs' Motion, Defendants alerted Plaintiffs that there were

5 errors in the caption in the proposed Third Amended Complaint filed as Exhibit A to the Lea

6 Declaration filed on February 22, 2008;

7       Defendants having no objection to the substitution of a corrected Third Amended

8 Complaint as Exhibit A to the Lea Declaration filed on February 22, 2008; and

9       A corrected proposed Third Amended Complaint is attached hereto as Exhibit A, which

10 corrects errors contained in the caption of Exhibit A to the Lea Declaration filed on February 22,

11 2008;

12       THEREFORE, the parties hereby stipulate and agree that:

13       The attached proposed Third Amended Complaint shall be substituted as Exhibit A to the

14 Lea Declaration filed on February 22, 2008, and shall be the proposed Third Amended Complaint

15 considered by the Court in connection with Plaintiffs' Motion.

16       IT IS SO STIPULATED.

17 Dated: __3/7__ , 2008           FUTTERMAN & DUPREE LLP

18

19                    Jamie L. Dupree (158105)
                   160 Sansome Street, 17th Floor

20                    San Francisco, CA 94104
                   Telephone: (415) 399-3840

21                    Facsimile: (415) 399-3838
                   jdupree@dfdlaw.com

22

23                    Jamie L. Dupree

24                    SCHLICHTER, BOGARD & DENTON
                   Jerome J. Schlichter (054513)
                   Daniel V. Conlisk *(Admitted Pro Hac Vice)*

25                    Heather Lea *(Admitted Pro Hac Vice)*

26                    Attorneys for Plaintiffs

27

28

2

FUTTERMAN &
DUPREE LLP

Dated: 3/7 , 2008          MORGAN, LEWIS & BOCKIUS LLP

*D. Ward Kallstrom ДД as amended 3/6/08*

D. Ward Kallstrom
Attorneys for Defendants

## ~~[PROPOSED]~~ ORDER

Having reviewed the parties' Stipulation and [Proposed] Order Substituting a Corrected Exhibit A to the Lea Declaration Filed in Support of Plaintiffs' Motion for Leave to File a Third Amended Complaint, and good cause shown,

IT IS HEREBY ORDERED that Exhibit A hereto, a proposed Third Amended Complaint with its caption corrected, shall be substituted for Exhibit A to the Lea Declaration filed on February 22, 2008, and shall be the proposed Third Amended Complaint considered by the Court in connection with Plaintiffs' Motion.

**IT IS SO ORDERED.**

Dated: ___ March 7 ___, 2008

HON___
UNITED

*IT IS SO ORDERED*

*Judge Charles R. Breyer*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

FUTTERMAN &
DUPREE LLP

# EXHIBIT A

SCHLICHTER, BOGARD & DENTON
JEROME J. SCHLICHTER (054513)
DANIEL V. CONLISK (Admitted Pro Hac Vice)
HEATHER LEA (Admitted Pro Hac Vice)
100 South Fourth Street, Suite 900
St. Louis, MO 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-7151
jschlichter@uselaws.com
dconlisk@uselaws.com
hlea@uselaws.com

*Attorneys for Plaintiffs and Class Representatives*

FUTTERMAN & DUPREE LLP
JAMIE L. DUPREE (158105)
160 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
jdupree@dfdlaw.com

*Local Attorneys for Plaintiffs and Class Representatives*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| BEVERLY KANAWI and SALVADOR AQUINO, as representatives of a class of similarly situated person, and on behalf of the Plan,<br><br>*Plaintiffs,*<br><br>v.<br><br>BECHTEL CORPORATION, THE BECHTEL TRUST AND THRIFT PLAN COMMITTEE, PEGGI KNOX, and FREMONT INVESTMENT ADVISORS,<br><br>*Defendants.* | Case No. C 06-05566 CRB (EDL)<br><br>**THIRD AMENDED COMPLAINT; DEMAND FOR JURY TRIAL CLASS ACTION** |

## INTRODUCTION

1.  In this action, pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiffs and

Class Representatives Beverly Kanawi and Salvador Aquino on behalf of all similarly situated participants and beneficiaries of the Trust and Thrift Plan ("Plan") seek to recover the financial losses suffered by the Plan and to obtain injunctive and other equitable relief for the Plan from Bechtel Corporation (the Plan Sponsor), the Trust and Thrift Committee of Bechtel Corporation, (the Plan Administrator), Fremont Investment Advisors, and other defendants identified below, based upon breaches of their fiduciary duties (collectively "Defendants").

2. As set forth in detail below, Defendants caused the Plan to include investment options with fees and expenses – paid by the Plan, and thus borne by Plan participants – that were and are unreasonable and excessive; not incurred solely for the benefit of the Plan and its participants; and undisclosed to participants. Further, as set forth below, Defendants' selection of investment options for the Plan was imprudent and improper in light of the Plan's size and enormous negotiating leverage in the investing marketplace. By subjecting the Plan and its participants to these imprudent investment options and the accompanying excessive fees and expenses, and by other conduct set forth below, Defendants violated their fiduciary obligations under ERISA and caused damages to the Plan.

## PARTIES, JURISDICTION AND VENUE

### Plaintiffs

3. Plaintiff and Class Representative Beverly Kanawi is a resident of Ocean Side, California.

4. Plaintiff and Class Representative Salvador Aquino is a resident of Union City, California.

5. Each Plaintiff and Class Representative is a former Bechtel employee.

6. Each Plaintiff and Class Representative is a participant in the Plan.

### Bechtel Defendants

7. Defendant Bechtel Corporation is a privately-held California corporation with its headquarters in San Francisco, California and at least forty offices and facilities located throughout the United States and around the world.

8. Bechtel Corporation describes itself as "one of the world's premier engineering,

construction, and project management companies," with revenues of more than $18 billion in 2005.

9.   Bechtel is the Sponsor of the Plan pursuant to ERISA § 3(16)(B).

10.   Defendant Bechtel Trust & Thrift Plan Committee (the "Committee") is the named fiduciary and Administrator of the Plan. Bechtel Corporation appoints the Committee. The Committee is comprised of Bechtel officers and employees.

11.   Defendant Peggi Knox is the principal Vice President of Retirement Plans of Bechtel Corporation, a fiduciary to the Plan, and the individual designated by Bechtel to sign documents on behalf of the Plan and Bechtel as Plan Sponsor.

## Fremont Investment Advisors

12.   Fremont Investment Advisors ("FIA") is a Delaware Corporation with its headquarters in San Francisco, California. FIA originated from an in-house investment advisory and management division of Bechtel. It was formed as an independent corporation in 1986 and has also been known as Sierra Asset Management.

13.   FIA was the primary investment advisory and administrative service provider to the Plan from 1986-2004. FIA was responsible for selecting, monitoring, evaluating, and terminating investment managers for the investment options, or "Funds" within the Plan. FIA negotiated the terms of the contracts with the investment managers who managed the Funds that served as investment options within the Plan. Fremont also managed its own proprietary funds, some of which were included in the Plan's investment lineup.

14.   In addition to its investment advisory role, FIA performed the main administrative functions for the Plan, including negotiating with, evaluating, and monitoring Plan service providers, including the recordkeeper, trustee, and consultants. FIA was responsible for reviewing all invoices and approving payments to service providers.

15.   From 1986 until 2004, FIA was a designated fiduciary and a functional fiduciary to the Plan.

16.   In Bechtel's Supplemental Interrogatory Responses served on December 17, 2007, Bechtel stated that Fremont Investment Advisors exercised authority or discretion over the

administration or management of the Master Trust.

**Jurisdiction and Venue:**

17. **JURISDICTION:** Plaintiffs bring this action pursuant to ERISA §§ 502(a)(2) & (3), 29 U.S.C. §§ 1132(a)(2) & (3), which provides that participants may pursue civil actions on behalf of the Plan to remedy breaches of fiduciary duty as set forth in ERISA § 409, 29 U.S.C. § 1109, and to obtain other appropriate equitable relief. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

18. All Defendants are subject to service of process issued from this Court pursuant to 29 U.S.C . §§ 1132(e)(1)(2).

19. Venue is proper in this Court pursuant to 29 U.S.C. § 1132 (e)(2) because the Plan is administered in this district, the breaches of fiduciary duty giving rise to this action occurred in this district, and the Defendants may be found in this district.

20. **INTRADISTRICT ASSIGNMENT:** Venue is proper in this division of this Court pursuant to Local Rules 3-2(c) and (d) in that a substantial part of Defendants' actions and omissions out of which this action arises occurred in San Francisco County, California.

**Rule 23 Requires Class Certification:**

21. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the Plan, themselves and all similarly situated participants of the Plan and beneficiaries. They seek to represent the following class (the "Class"):

> All persons, *excluding the Defendants and other individuals who are or may be liable for the conduct described in this Complaint,* who are or were participants or beneficiaries of the Plan and who are, were, or may have been affected by the conduct set forth in this Complaint, as well as those who will become participants or beneficiaries of the Plan in the future.

22. Certification of this Class is proper under Rule 23(a) in that:

    A. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Although the Plaintiffs do not know the exact number of Class members as of the date of filing, the Plan's public documents state that, at the end of the 2006 Plan year, there were 16,215 participants with account balances in

the Plan.

B.   **Commonality.** Common issues of fact and law predominate over any issues unique to individual Class members. Issues that are common to all Class Members include, but are not limited to, whether the Defendants:

    i.    Included investment options in the Plan which were imprudent and improper in light of the Plan's size and negotiating leverage;

    ii.    Included investment options that caused participants' retirement savings to consistently under-perform the market in long-term retirement savings;

    iii.    Failed to consider investment options with low costs that are available to large plans;

    iv.    Failed to capture profits available to the Plan because of its size from such activities as securities lending and interest on float;

    v.    Subjected the Plan to fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

    vi.    Caused the Plan to enter into agreements with third-parties which caused the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

    vii.    Failed to monitor the fees and expenses paid by the Plan and, by such failure, caused the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants;

    viii.    Failed to inform themselves of, and understand, the various methods by which vendors in the 401(k), financial and retirement industry collect payments and other revenues from 401(k) plans;

| | | |
|---|---|---|
| 1 | ix. | Failed to establish, implement, and follow procedures to properly |
| 2 | | and prudently determine whether the fees and expenses paid by the |
| 3 | | Plan were reasonable and incurred solely for the benefit of Plan |
| 4 | | participants; |
| 5 | x. | Failed properly to inform, and/or disclose to, Plan participants the |
| 6 | | fees and expenses that are, or have been, paid by the Plan; |
| 7 | xi. | Failed to inform, and/or disclose to Plan participants in proper |
| 8 | | detail and clarity the transaction fees and expenses which affect |
| 9 | | participants' account balances in connection with the purchase or |
| 10 | | sale of interests in investment alternatives; |
| 11 | xii. | Breached their fiduciary duties by failing to disclose that hidden |
| 12 | | and excessive fees were and are being assessed against Plan assets, |
| 13 | | and by failing to stop such hidden excessive fees; |
| 14 | xiii. | In charging, causing to be charged or paid, and failing to monitor |
| 15 | | the fees and expenses of the Plan, failed to exercise the care, skill, |
| 16 | | prudence, and diligence that a prudent person would when acting |
| 17 | | in like capacity and familiar with such matters; |
| 18 | xiv. | Caused and/or allowed fees and expenses to be paid by the Plan for |
| 19 | | purposes other than those allowed by ERISA; |
| 20 | xv. | Entered into prohibited transactions in connection with the Plan |
| 21 | | and its assets; |
| 22 | xvi. | Labored under, and performed their duties to the Plan while parties |
| 23 | | to, conflicts of interest; |
| 24 | xvii. | Engaged in self-dealing and self-interested transactions involving |
| 25 | | the Plan and Plan assets; |
| 26 | xviii. | By the conduct above and/or by other conduct set forth in this |
| 27 | | Complaint, revealed in discovery, and/or proven at trial, breached |
| 28 | | their fiduciary and other ERISA-imposed obligations to the Plan, |

Plan participants, and members of the Class;

    xix.    Are liable to the Plan for losses suffered as a result of the breaches of their fiduciary duties and other ERISA-imposed obligations; and

    xx.    Are responsible to account for the assets and transactions of the Plan and should be charged/surcharged for any transactions and payments for which they cannot account or which were not proper uses of Plan assets.

C.    **Typicality.** The claims brought by the Plaintiffs are typical of those of the absent Class members, in that:

    i.    This action arises out of fiduciary obligations that Defendants owed/owe to the Plan and this action is brought on behalf of the Plan itself;

    ii.    The Defendants owed the exact same fiduciary and other ERISA-based obligations to the Plan and each Plan participant and beneficiary and each member of the Class;

    iii.    The Defendants' breach of those obligations constitutes a breach to the Plan and each participant and beneficiary and each member of the Class;

    iv.    The damages that will be forthcoming in this action accrue to the benefit of, and will be paid to, each Plan to be distributed among Plan participants by Plan fiduciaries after judgment is rendered.

    v.    To the extent that there are any differences in the effect on Class members resulting from Defendants' breaches of fiduciary duty; such differences would not arise until after an award is made to the Plan and would be resolved through simple mathematics. Such minimal and formulaic differences are no impediment to class certification.

D.    **Adequacy of Representation.** The Plaintiffs are adequate

representatives of the absent Class members and will protect such absent Class members' interests in this litigation. The Plaintiffs do not have any interests antagonistic to the other class members nor do they have any unique claims or defenses that might undermine the efficient resolution of the Class' claims. Plaintiffs have retained competent counsel, versed in ERISA, class actions, and complex litigation.

23. Class certification is also appropriate under Rule 23(b) and each subpart in that:

A. Pursuant to Rule 23(b)(1)(A), in the absence of certification, there is a risk of inconsistent adjudications with respect to individual class members;

B. Pursuant to Rule 23(b)(2), as set forth above, the Defendants have acted on grounds generally applicable to the Class as a whole; and

C. Pursuant to Rule 23(b)(3), as set forth above, common issues of law and fact predominate over any purely individual issues and thus a class action is superior to any other method for adjudicating these claims.

## FACTS APPLICABLE TO ALL COUNTS

### The Plan

24. The Plan is a "defined contribution plan," as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), and contains or is part of an "eligible individual account plan" under ERISA § 407(d)(3)(A), 29 U.S.C. §1107(d)(3)(A) . It is also a tax-qualified plan of the type popularly known as a "401(k) plan."

25. ERISA requires that the Plan be maintained as a single unitary trust in which participants have beneficial interests.

26. Defendants administer the Plan through a Master Trust. The Master Trust combines the assets of the Plan with the assets of the Becon Trust and Thrift Plan.

27. At all relevant times, the Plan constituted over 99 percent of the assets in the

8

Master Trust.

### Defendants' Fiduciary Duties To The Plan Under ERISA

28. ERISA imposes on Defendants fiduciary duties that are "the highest known to law." Defendants' fiduciary obligations require that, at all times, they conduct themselves with the utmost good faith, loyalty and fidelity; act with the sole purpose of advancing the interests of the Plan, its participants, and beneficiaries; scrupulously avoid all self-interest, duplicity, and deceit; and fully disclose to and inform participants and beneficiaries of all material information.

29. ERISA requires that Defendants exercise their fiduciary obligations with the care, skill, and diligence which a prudent expert would in the operation of a Plan with like character and aims.

30. Defendants' fiduciary obligations under ERISA require that they discharge their duties with the exclusive purpose of providing benefits to Plan participants and beneficiaries and defraying the reasonable cost of administering the Plan.

31. ERISA requires that Defendants ensure, at all times, that Plan assets are *never* used for the benefit of its fiduciaries, here, Bechtel and FIA.

32. ERISA requires that Defendants scrupulously avoid any transaction in which Plan assets would be used by, or inure to the benefit of, a party-in-interest'; all conflicts of interest; and all prohibited transactions.

### DEFENDANTS' MULTIPLE BREACHES OF FIDUCIARY DUTY

### Unreasonable and Excessive Plan Fees and Expenses

33. Defendants have breached their fiduciary obligations by causing the Plan, and thus its participants and beneficiaries, to pay excessive and unreasonable fees and expenses to Plan service providers.

34. These excess payments took the form of "Hard Dollar" payments (direct payments from the Plan to a service provider), Revenue Sharing transfers, and Additional Compensation Streams (discussed below) which Plan fiduciaries failed to capture for the benefit of the Plan.

35. Defendants caused the Plan to make Hard Dollar payments that were, in an of themselves – and not including Revenue Sharing transfers – excessive and unreasonable for a

FUTTERMAN &
DUPREE LLP

THIRD AMENDED COMPLAINT
CASE NO. C 06-05566 CRB (EDL)

Plan the size and character of the Plan.

36.     In addition to the excessive and unreasonable fees paid through Hard Dollar payments, the Defendants caused the Plan to pay additional excessive fees to Plan service providers through undisclosed Revenue Sharing arrangements.

37.     In Revenue Sharing arrangements, Plan fiduciaries, like the Defendants here, select Funds that assess asset-based charges ("expense ratios") against Plan participants' retirement savings for the ostensible purpose of operating *the Fund* and managing *Fund* investments. But in truth, such expense ratios include *both* fees collected for these ostensible purposes *and* excessive fee assessments collected for the purpose of providing "soft dollars" for the Fund's Revenue Sharing program.

38.     Based upon the ostensible reasons for which Fund expense ratios are imposed, the Plan and its Plan participants are led to expect and believe that the fees collected from the Plan, and thus their retirement savings, will benefit them by paying proper costs of operating the Fund and managing its investments.

39.     This, however, is false. The Funds transfer the soft dollars collected via Revenue Sharing programs to other Plan service providers.

40.     As a result of Revenue Sharing arrangements, Plan service providers or others who do business with the Plan or the Fund received either or *both* Hard Dollar payments from the Plan *and* additional revenue that the Fund "shares" with them. In addition to this, they receive compensation from the Additional Compensation Streams defined below.

41.     As a result of such arrangements, the Bechtel Defendants and FIA have caused the Plan to bear fees and expenses that were unreasonable and excessive.

42.     The Plan's administrative fees and expenses are a multiple of the level appropriate for a plan the size and character of the Plan, such that the Plan has been forced to pay millions of dollars in excess each year.

43.     Similarly, as a result of the investment options Defendants have selected for inclusion in the Plan, the Plan's investment management expenses have been excessive for a plan the size and character of the Plan. The Plan has paid fees that rival or exceed those charged to

FUTTERMAN &
DUPREE LLP

individual retail investors, and Defendants have thus squandered the Plan's enormous bargaining power in the investment marketplace.

44.     By subjecting the Plan to such excessive fees and expenses, and by selecting investment options that assessed excessive fees against participants' accounts directly and through for Revenue Sharing programs, Defendants breached their fiduciary duties.

45.     Further, FIA both imposed Hard Dollar Fees *and* retained the Revenue Sharing allocations from Funds which it directly manages.

46.     As a result, FIA received direct Hard Dollar payments, *and* soft dollars it collected and retained through Revenue Sharing programs.

47.     As a result, FIA, a Plan fiduciary, received excess and unreasonable compensation.

48.     Bechtel allowed FIA, and other service providers to the Plan, to receive excessive and unreasonable compensation by failing to monitor properly FIA's services or compensation.

### Prohibited Transactions Under ERISA § 406, 29 U.S.C. § 1106

49.     Bechtel's selection and continuation of the agreement with FIA was not in the best interests of participants. It was rather the product of a longstanding relationship with FIA's founders, who were former Bechtel employees.

50.     For example, Riley Bechtel, Chairman and CEO of Bechtel, serves on the Board of Directors for Fremont Group, the parent of FIA during which Bechtel – a corporation closely held by the Bechtel family – used FIA as the Plan's primary fiduciary and investment advisor.

51.     Bechtel and FIA negotiated services and fees – to be borne by the Plan – that were in excess of market rates for a plan the size and character of the Plan. Worse yet, they often were duplicative of the services provided by other entities and fees Defendants caused the Plan to pay to other entities.

52.     FIA's excessive compensation was the result of a series of prohibited transactions, described above, where FIA received undisclosed and unmonitored revenue sharing payments from Plan service providers whom FIA selected and with whom FIA negotiated the terms of engagement.

FUTTERMAN &
DUPREE LLP

**Failure to Capture Additional Compensation Streams For the Benefit of the Plan**

53. Beyond collecting fees from the Plan through Hard Dollar and Revenue Sharing payments, Plan service providers received additional, undisclosed compensation from their dealings with the Plan and Plan assets ("Additional Compensation Streams"). For example:

- recordkeepers, trustees, consultants, investment advisors, and investment managers received soft-dollars from brokerage commission recapture programs;

- consultants received finders' fees from investment managers for the consultants' placement of Plan assets with the investment manager or mutual fund company;

- trustees or custodial banks performed cash sweeps of Plan accounts to capture cash before it is transferred to investment options, and earned interest on those cash holdings;

- investment managers, custodial banks, prime bankers, and/or mutual funds received payments for lending securities, owned by the Plan, to third parties; and

- in connection with foreign investments, trustees, investment managers, and mutual funds reaped additional compensation from profiting on foreign currency exchange.

54. In a multi-billion dollar plan, like the Plan here, such Additional Compensation Streams can result in millions of dollars funds which, if captured by Plan fiduciaries, would be available to the Plan and to defray or eliminate Plan expenses.

55. Accordingly, Plan fiduciaries must also understand and consider these Additional Compensation Streams in fulfilling their fiduciary obligations to ensure that all such revenues -- derived directly from Plan assets -- are captured for the Plan and applied solely for the benefit of the Plan and its participants and beneficiaries.

56. Here, Defendants have failed to do so.

**Defendants' Inclusion of Retail Mutual Funds Among The Plan's Investment Options**

57.     The prudent and proper selection of investment options for the Plan is one of Defendants' core fiduciary obligations.

58.     The selection of Funds for inclusion on the Plan's menu of investment options is a function wholly within the discretion and control of Plan fiduciaries. Participants have no control over, or discretion in, selecting the Fund that are included on the Plan's menu of investment options.

59.     In their sole power and discretion in this regard, Defendants included retail mutual funds and several custom blend funds as Plan investment options.

60.     Several of the Plan investment options amounted to funds of funds, which merely add layers of fees that ultimately hinder performance and provide little to no benefit to participants.

61.     In 2006, the Master Trust held approximately $4.2 billion in assets. In 2005, it held approximately $3.8 billion, and in 2004, $3.6 billion. In 2006, the Bechtel Trust and Thrift Plan held approximately $4.2 billion. In 2005, it held approximately $3.8 billion, and in 2004, $3.6 billion.

62.     Neither retail mutual funds nor funds of funds are appropriate for a plan with an asset size as large as the Bechtel Trust and Thrift Plan.

63.     In the financial and investments industry, a large institutional investor with billions of dollars, like the Plan, routinely can obtain lower prices for investment management and other services than can a retail investor with only thousands, or even a few million, dollars.

64.     Defendants – as fiduciaries of a multi-billion dollar retirement savings plan – had enormous bargaining leverage. They squandered this leverage by subjecting the Plan and its participants to the high costs of retail/publicly-traded mutual funds and failing to provide investment options with significantly lower costs.

65.     As fiduciaries, Defendants were obligated to use the Plan's bargaining power to secure lower fees to be assessed against the Plan by requiring that investment managers provide separate low cost investment accounts, collective investment trusts, or common collective funds

FUTTERMAN &
DUPREE LLP

("Separate Accounts") or similar investment vehicles as Plan investment options.

66. Separate Accounts are investment vehicles in which investment managers pool the assets of a large investor, like the Plan, into a private trust and manage them according to a stated investment objective. Like mutual funds, Separate Accounts offer various investment styles (large cap, value, growth, balanced growth, small cap, international equity, etc.).

67. However, Separate Accounts' operating expenses are substantially lower than those of mutual funds because they do not have to pay for advertising, marketing, and distribution, nor do they have to maintain the liquidity required for trading in publicly-traded mutual funds.

68. Separate accounts also avoid subjecting Plan participants to conflicts of interest inherent in large mutual fund organizations. Mutual fund managers' own profit motive – driven by the assessment of fees against the fund's investments – conflict with investors' interest in reducing fees to maximize their returns.

69. In 2004, the Bechtel Defendants substantially altered the investment options offered through the Plan, moving out of mutual funds and into separate accounts. In doing so, Plan fiduciaries admitted that the majority of the expenses borne by the Plan prior to this change were both excessive and invisible to participants. Defendants estimated this annual excess at almost $6 million.

70. Worse yet, after recognizing that the Plan had been paying excessive fees to FIA for years, the Bechtel Defendants made no secure any refund from FIA or otherwise recover the excessive payments so as to remedy the losses the Plan had incurred.

### Plan's Payments for Active Investment Management

71. Most of the Plan's funds are actively managed, and this has been true for years. In actively-managed funds, the investment managers seek to outperform the Fund's benchmark, to "beat the market." Active management is more expensive than passive management, where Fund managers conform their holdings to those of a particular benchmark. Passive managers provide market returns for low fees.

72. Defendants' inclusion the actively-managed mutual funds that they selected for

14

the Plan was and is detrimental to the interests of the Plan and its participants and beneficiaries. It repeatedly has been established that actively managed mutual funds rarely outperform market indexes on a risk-adjusted basis when held as long-term investments, and the mutual funds here did not do so.

73.     Defendants' inclusion in the Plan of these actively-managed funds provided (and provides) no added value to participants while forcing them to bear substantial and unnecessary fees.

74.     The high costs of these funds did benefit Defendants, however, in that they provided substantial Revenue Sharing and soft-dollars that were used for the benefit of FIA.

75.     Defendants' selection of these actively managed mutual funds as Plan investment options virtually guaranteed that the Plan and its participants and beneficiaries would receive less than market returns on their long-term retirement savings.  With proper and prudent investment options, they could have received market returns.

76.     In doing so, Defendants breached their core fiduciary duties to the Plan.

**Defendants' Campaign of Misrepresentation and Non-Disclosure**

77.     Through the use of Hard Dollar payments and undisclosed Revenue Sharing programs, Defendants have concealed from the Plan and its participants how much they are paying for Plan recordkeeping and administration, to whom such they are making such payments, and how.

78.     As set forth above, Defendants have not disclosed, and/or have affirmatively concealed, a litany of material information including:

A.     That FIA and the Bechtel Defendants have undertaken numerous prohibited transactions and labored under serious and ongoing conflicts of interest;

B.     That Bechtel failed to properly select and monitor service providers according to accepted standards and process;

C.     That the Plan's size and asset value enabled Defendants to provide lower-priced investment options;

D.   That the fees charged, including fees for active investment management, assessed against participants' retirement savings were depriving them of the opportunity to receive market returns;

E.   That the excessive fees and expenses assessed the Plan substantially would undermine the Plan's asset value and participants' retirement savings over time;

F.   That by including retail/publicly-traded mutual funds as Plan investment options, Defendants had squandered the Plan's enormous bargaining power and left participants of a $3.6 billion plan in the same circumstances as small, retail investors;

G.   That Plan service providers maintained undisclosed Revenue Sharing programs to collect soft dollars, and the amount they were receiving from transfers of those soft dollars;

H.   That Revenue Sharing was, and is, available for the benefit of the Plan and its participants;

I.   That Plan service providers were and/or are receiving excessive payments via Additional Compensation Streams, and that such monies were available for the benefit of the Plan but not captured;

J.   That the expense ratios charged in Plan investment options were and are inflated to collect soft dollars for the purpose of supporting Revenue Sharing programs and, as a result, are not used for the investment management and operation of the investment option/Fund (i.e. the ostensible purpose for the imposition of such fees);

K.   That such revenue sharing programs were a conduit for the payment of excessive fees to FIA, a Plan fiduciary;

L.   That the expense ratios of Plan investment options/Funds are inflated to collect soft dollars used to support Revenue Sharing

programs and soft dollar transfers so that the *stated expense ratio is not the true and accurate cost of investing* in the investment option/Fund;

M. Who is receiving Plan assets, derived from participants' accounts, and collected as part of Revenue Sharing programs and/or Additional Compensation Streams;

N. How much each service provider is paid with Plan assets, derived from participants' accounts, when Hard Dollar fees *and* Revenue Sharing transfers *and* Additional Compensation Streams are considered;

O. Whether the total amount paid to services providers (*i.e.* disclosed, Hard Dollar fees *combined with* Revenue Sharing payments *and* Additional Compensation Streams) is reasonable in light of the services provided and incurred solely for the benefit of the Plan and its participants and beneficiaries;

P. Whether plan fiduciaries have forgone available Revenue Sharing transfers and/or Additional Compensation Streams available in connection with Plan investment options, and thereby unnecessarily increased the expenses which the Plan must bear;

Q. The true and accurate amount of recordkeeping and administrative fees that is assessed against the Plan; in that Plan record keepers and administrators receive *both* the fees disclosed as Hard Dollar payments to them and *undisclosed* payments derived from Revenue Sharing programs;

R. The administrative cost participants must pay to participate in the Plan;

S. The true and accurate price of Plan investment options/Funds, in that the stated expense ratios of Plan investment options/Funds are

FUTTERMAN &
DUPREE LLP

overstated so as to collect extra, hidden soft dollars to be used to support Revenue Sharing programs transferring money to FIA and other Plan service providers;

T. The true and accurate amount of fees paid to investment managers *for actual investment management services* (*i.e.* the actual amount of investment management being purchased) in any Plan investment option/Fund; in that the investment management prices represented in the expense ratios of Plan investment options/Funds are overstated so as to collect soft dollars to be used for Revenue Sharing programs and excessive payments to FIA;

U. In actively-managed investment options/Funds, the actual amount of active management services that Plan participants are purchasing, in that the undisclosed collection of soft dollars via inflated expense rations to support Revenue Sharing programs renders participants incapable of knowing whether the fees charged by actively-managed Funds actually are used for active investment management rather for Revenue Sharing programs that provide no benefit to fund investors and transfer undisclosed compensation to FIA; and

V. That the Plan was paying FIA duplicative fees for duplicative services;

W. That due to Defendants improper selection of investment options and prohibited transactions, the Plan paid millions of dollars in excessive and unreasonable fees, including excessive payments to FIA.

79. In fact, Defendants have admitted that up to at least 2004, the fees charged to the Plan were hidden in the net asset valuations of the Plan's investment options: the fees were deducted prior to each investment options' return was calculated. This made the fees effectively

invisible to participants; they were not reflected on participants' statements nor otherwise available in the information Defendants provided.

80. Because the Defendants failed and refused to provide them with this information, and concealed this information from them, Plan participants have lacked the information necessary for them: (a) to understand and protect their interests in the Plan; (b) to have knowledge regarding the Defendants' breaches of fiduciary duty; and (3) to have reason to believe they should make inquiry about those breaches and the facts underlying them.

81. Defendants know that Plan participants lack such information and knowledge.

82. In their fiduciary roles, Defendants are the parties with the information necessary to know and understand whether the participants' rights and protections under ERISA are being, or have been, violated. ERISA fiduciaries, such as Defendants here, have an affirmative obligation to provide full and accurate information to the Plan participants regarding the administration of the Plan. They failed to do so.

83. Further, Defendant Bechtel failed to properly select or monitor service providers, including but not limited to FIA. Such failures directly resulted in the breaches of duty described above and losses to Plan.

84. As a result of all of the foregoing, including Defendants' campaign of non-disclosure, concealment and misrepresentation, Plaintiffs and all Plan participants and beneficiaries have been forced to pay excessive fees and expenses from their 401(k) accounts, have suffered financial losses and damages, and have been deprived of the opportunity to receive market returns.

**COUNT I**
**Breach of Fiduciary Duty – ERISA §502(a)(2)**

85. Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 84 as though fully set forth here.

86. As set forth in detail above, Defendants owe to the Plan, its participants and beneficiaries, and the Class extensive fiduciary duties including, without limitation:

A.  To conduct itself as Plan Sponsor and Administrator with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent ERISA professional fiduciary would in operating and administering a 401(k) plan the size and character of the Plan;

B.  To perform its duties as Plan Sponsor and Administrator with the utmost loyalty and fidelity to the Plan and its participants and beneficiaries, avoiding at all times conflicts of interest, self-interest, and duplicity;

C.  To ensure, at all times, that Plan assets "shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan;"

D.  To properly select and monitor fiduciaries and service providers to the Plan;

E.  To properly and prudently select investment alternatives for the Plan;

F.  To ensure, at all times, that the Plan avoids prohibited transactions;

G.  To know and understand the fees and expenses charged to the Plan, and whether they were or are unreasonable or excessive;

H.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets are retained, managed, and disbursed in compliance with the Plan Document and ERISA;

I.  To track and account for all transactions involving the Plan and Plan assets so as to ensure that Plan assets "never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their

FUTTERMAN &
DUPREE LLP

beneficiaries and defraying reasonable expenses of administering
the Plan;"

J.   To ensure that the fees and expenses incurred by the Plan are
reasonable and incurred for the sole and exclusive benefit of Plan
participants and beneficiaries;

K.   In entering into agreements with service providers to the Plan, to
ensure that the payments from the Plan – whether they are direct or
indirect – are reasonable for the services provided and made for the
sole and exclusive benefit of Plan participants and beneficiaries;

L.   In operating and administering the Plan, to establish, implement,
and follow procedures to properly and prudently determine whether
the fees and expenses paid by the Plan were reasonable and
incurred solely for the benefit of Plan participants;

M.   In operating and administering the Plan, on an ongoing basis to
monitor that the payments made by the Plan to service providers –
whether they are direct or indirect – are and remain reasonable for
the services provided and made for the sole and exclusive benefit
of Plan participants and beneficiaries;

N.   To inform itself of, and understand, the various methods by which
vendors in the 401(k) industry collect payments and other revenues
from 401(k) plans;

O.   To inform itself of trends, developments, practices, and policies in
the retirement, financial investment, and securities industry which
affect the Plan; and to remain aware and knowledgeable of such
trends, practices, and policies on an ongoing basis;

P.   To communicate with Plan participants and beneficiaries regarding
the Plan honestly, clearly, and accurately;

Q.   To affirmatively and without request provide Plan participants and

beneficiaries with honest, accurate and complete information they need to understand their investments in the Plan; the management, risk, potential returns of such investments; and the fees and expenses incurred in connection with those investments; and

R.   To provide honest, accurate and complete information to Plan participants and beneficiaries regarding the costs associated with their various investment choices and directions.

87.   As set forth in detail above, Defendants breached their fiduciary obligations to the Plan, Plan participants and beneficiaries and the Class by, among other conduct to be proven at trial:

A.   Squandering the Plan's enormous bargaining power to obtain low-cost investments, and instead subjecting the Plan and its participants and beneficiaries to high-priced retail/publicly traded mutual funds;

B.   Failing to employ the Plan's enormous bargaining power to obtain separate accounts and/or other low-cost investment options appropriate for a multi-billion dollar 401(k) plan;

C.   Failing to use the Plan's enormous bargaining power to obtain low-cost funds which provide a market return;

D.   Failing to properly and prudently select plan investment options, making selections for self-interested reasons, and/or abdicating their responsibilities in this regard;

E.   Causing or allowing the Plan to enter into agreements with service providers under which the Plan and continues to pay – directly or indirectly – fees and expenses that were, and continue to be unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

F.   Allowing the Plan to pay – directly on indirectly – fees and

FUTTERMAN &
DUPREE LLP

expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

G.    Engaging in prohibited transactions;

H.    Failing to monitor the fees and expenses paid by the Plan and, by such failure, causing and/or allowing the Plan to pay fees and expenses that were, or are, unreasonable and/or not incurred solely for the benefit of Plan participants and beneficiaries;

I.    Engaging in, and causing the Plan to engage in, prohibited transactions;

J.    Engaging in, and causing Plan assets to be used in, self-interested transactions and conflicts of interest;

K.    Failing to select properly and monitor fiduciaries and service providers to the Plan;

L.    Failing to know and understand the fees and expenses charged to the Plan, and whether they were or are unreasonable or excessive;

M.    Failing to inform itself of trends, developments, practices, and policies in the retirement, financial investment, and securities industry which affect the Plan; and failing to remain aware and knowledgeable of such trends, practices, and policies on an ongoing basis;

N.    Failing to inform itself of, and understand, the various methods by which vendors in the 401(k) industry collect payments and other revenues from 401(k) plans;

O.    Failing to establish, implement, and follow procedures to properly and prudently determine whether the fees and expenses paid by the Plan were reasonable and incurred solely for the benefit of Plan participants;

P.   Failing to communicate with Plan participants and beneficiaries regarding the Plan honestly, clearly, and accurately;

Q.   Causing numerous retail mutual funds to be included as Plan investment options, and thereby breaching their fiduciary duty to select reasonable and prudent investment choices for the Plan and diluting the Plan's bargaining power, based upon its asset size, to secure lower cost investment options;

R.   Allowing Plan service providers, at the Plan's expense, to receive Revenue Sharing transfers, and failing to capture Revenue Sharing for the benefit of the Plan and its participants;

S.   Allowing Plan service providers, at the Plan's expense, to receive Additional Compensation Streams; and failing to capture Additional Compensation Streams for the benefit of the Plan and its participants;

T.   Failing properly to inform and/or disclose to Plan participants the fees and expenses that are, or have been, paid by the Plan;

U.   Failing to inform and/or disclose to Plan participants in proper detail and clarity the transactions, fees and expenses which affect participants' accounts balances in connection with the purchase or sale of interests in investment alternatives;

V.   Failing to discover, disclose, and stop the charging of hidden and excessive fees to the Plan;

W.   Failing to disclose to Plan participants and beneficiaries that the Plan's investment options subjected their retirement savings to excessive and unreasonable fees in light of the Plan's size and bargaining power in the investment marketplace;

X.   Failing to disclose to Plan participants and beneficiaries that Defendants had chosen plan investment options without

24

considering appropriate information and investment alternatives in
light of the Plan' size and asset value; and

Y.   By the foregoing conduct, failing to exercise the loyalty, fidelity,
care, skill, prudence, and diligence that a prudent person would
when acting in like capacity and familiar with such matters.

88.   Further, the Bechtel Defendants breached their fiduciary obligations to the Plan to
properly select and monitor fiduciaries and service providers to the Plan;

89.   As set forth in detail above, as a result of these breaches, the Plan, Plaintiffs, the
Class, and the Plan's participants and beneficiaries have suffered financial losses and damages.

90.   At all times, the Bechtel Defendants and FIA were co-fiduciaries, and each
knowingly participated in the fiduciary breaches of the other.

91.   Alternatively, at all times FIA was a party-in-interest and knowingly participated
in Bechtel's Fiduciary breaches.

92.   Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are
personally liable to make good to the Plan for the losses it experienced as a result of Defendants'
breaches of fiduciary duty.

93.   Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a), Defendants are
personally liable for any other available and appropriate equitable relief, including prospective
injunctive relief and declaratory relief, and attorney's fees.

## COUNT II:
**Other Remedies for Breach of Fiduciary Duty Against all Defendants – ERISA §502(a)(3)**

94.   Plaintiffs restate and incorporate the allegations contained in ¶¶ 1 through 93 as
though fully set forth here.

95.   In addition to, and as an alternative to, the causes of action stated in Count I,
Plaintiffs seek further relief pursuant to  ERISA § 502(a)(3), 29 U.S.C., § 1132(a)(3).

96.   Under ERISA §502(a)(3), a participant may enjoin any act which violates ERISA
or may obtain other appropriate equitable relief to redress such violations or enforce the terms of
ERISA.

97.     Defendants are fiduciaries of the Plan and occupy a position of trust and confidence in connection with the Plan, the Plan's assets, and the Plan's participants and beneficiaries.

98.     Defendants have exclusive discretion and control over the Plan's assets and are strictly obligated to exercise that control "for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan."

99.     By accepting possession and control over Plan participants' assets, Defendants necessarily have also accepted the obligation to explain and account for every transaction, expenditure, application and distribution of such assets.

100.    Although *only* Plan participants and beneficiaries are entitled to Plan assets and to the benefit of Plan assets, in the absence of full and candid disclosure from Defendants, the Plan and its participants and beneficiaries do not know, and have no means of knowing, how Plan assets have been managed and disbursed.

101.    Accordingly, Defendants occupy the position of a common law trustee in connection with the Plan, its assets, and its participants and beneficiaries.

102.    As set forth in detail above, Defendants have caused and/or allowed the Plan to pay – directly and via hidden Revenue Sharing transfers and hidden Additional Compensation Streams – excess fees and expenses to Plan service providers.   Litigating and resolving these issues will involve identifying and reconciling multiple transfers, payments, and flows of Plan assets that occurred while such Plan assets were within Defendants' possession and control.

103.    Defendants, and not the Plaintiffs, are the entities which have and/or should have specific and detailed information regarding how Plan assets have been treated and disbursed in this regard.

104.    An accounting is a particularly appropriate equitable remedy in circumstances where, as here, the underlying action and accounts are so complicated that a normal action for a fixed sum may not be practical.

105.    In such an accounting, in light of their possession and control of Plan assets and

1 information about how Plan assets have been applied and distributed, Defendants must bear the

2 burden of proving all Plan transactions and their propriety.

3       106.    Accordingly, the Court should order that Defendants render an accounting of all

4 transactions, disbursements and dispositions occurring in, in connection with, and/or in respect

5 of, the Plan and its assets.

6       107.    Plaintiffs respectfully request that the Court order that such an accounting include,

7 without limitation, detailed and specific information regarding all fees and expenses incurred by

8 the Plan and/or paid to any Defendants or third parties, whether paid directly by the Plan or

9 indirectly transferred among Plan service providers or other third parties and all Additional

10 Compensation streams generated from, or in respect to, Plan assets.

11       108.    Plaintiffs respectfully request that the Court charge/surcharge against the

12 Defendants and in favor of the Plan all amounts involved in transactions which such accounting

13 reveals were or are improper, excessive and/or in violation of ERISA.

14       109.    Plaintiffs respectfully request that the Court order Defendants to disgorge all

15 amounts credited to Bechtel for administrative costs which Bechtel was obligated to pay and

16 which Defendants assured Plan participants it did pay.

17       110.    Plaintiffs respectfully request that the Court order Defendants to disgorge all

18 amounts credited paid to FIA through, or in connection with, any prohibited transactions, and

19 self-interested transactions, and/or any transactions or disbursement affected by any conflict of

20 interest.

21       111.    Plaintiffs further seek injunctive and other appropriate equitable relief to redress

22 the wrongs described above and to cause them to cease so that the Plan and its participants and

23 beneficiaries to receive the full benefit of its assets in the future.

24 

**COUNT III:**
**Other Remedies for Breach of Fiduciary Duty Against FIA – ERISA §502(a)(3)**

25

26       112.    Plaintiffs restate and incorporate the allegations contained in paragraphs 1 through

27 111 as though fully set forth here.

28

113. As a further alternative to the causes of action stated in Counts I and II, Plaintiffs seek further relief against Defendant FIA pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

114. Among the remedies available under it, §503(a)(3) is for equitable restitution.

115. By secretly collecting soft dollars from the Plan to support its Revenue Sharing program and retaining the Revenue Sharing monies, as well as monies from the Additional Compensation Streams, as described above, Defendant FIA obtained funds that should have been used solely for the benefit of the Plan and its participants and beneficiaries, for the exclusive purposes of providing benefits to Plan participants and beneficiaries; and for defraying reasonable expenses of administering the Plan.

116. FIA knew that the monies removed from the Plan to support its Revenue Sharing program were the Plan assets, and, if they were not so removed, would continue to be Plan assets.

117. FIA knew that such assets were to be used solely for the benefit of Plan participants and beneficiaries and for the exclusive purposes of providing benefits to Plan participants and beneficiaries and defraying reasonable expenses of administering the Plan.

118. In removing such assets from the Plan, FIA engaged in prohibited transactions, self-interested transactions, and conflicts of interest.

119. Because they were not used for purposes not permitted by ERISA, these monies rightfully and in good conscience belong to the Plan and its participants and beneficiaries.

120. The Revenue Sharing monies are specifically identifiable funds.

121. The Revenue Sharing monies are in the possession and custody of FIA.

122. Plaintiffs, on behalf of the Plan, seek equitable restitution of the Revenue Sharing payments, along with any profit, from FIA.

WHEREFORE Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- find and declare that the Defendants have breached their fiduciary duties as described above;

- find and adjudge that Defendants are personally liable to make good to the Plan all losses that the Plan incurred as a result of the conduct described

above and to restore the Plan to the position it would have been in but for the breaches of fiduciary duty;

- award actual damages to the Plan in the amount of its monetary losses;

- impose a constructive trust on any monies by which the Defendants were unjustly enriched as a result of their breaches of fiduciary duty and cause the Defendants to disgorge such monies and return them to the Plan;

- remove the fiduciaries who have breached their fiduciary duties and/or enjoin them from future breaches of ERISA;

- require Defendants to render an accounting as set forth above;

- surcharge against Defendants and in favor of the Plan all amounts involved in transaction which such accounting reveals were or are improper, excessive and/or in violation of ERISA;

- permanently enjoin Defendants from breaching their fiduciary duties in each respect set forth in the Complaint;

- award to the Plaintiffs and the Class their attorneys fees and costs pursuant to ERISA § 502(g);

- order costs and attorneys fees pursuant to ERISA § 502(g) and the common fund doctrine;

- order equitable restitution or other available equitable relief against the Defendants;

- order the payment of interest to the extent it is allowed by law; and

- grant any other and further relief the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 22, 2008

Respectfully submitted,

SCHLICHTER, BOGARD & DENTON

/s/ Daniel V. Conlisk
Daniel V. Conlisk (*Admitted Pro Hac Vice*)

Jerome J. Schlichter (054513)
Daniel V. Conlisk (*Admitted Pro Hac Vice*)\
Heather Lea (*Admitted Pro Hac Vice*)
100 South Fourth Street, Suite 900
St. Louis, MO 63102
Telephone: (314) 621-6115
Facsimile: (314) 621-7151
hlea@uselaws.com
jschlichter@uselaws.com
dconlisk@uselaws.com

FUTTERMAN & DUPREE LLP
Jamie L. Dupree (158105)
160 Sansome Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 399-3840
Facsimile: (415) 399-3838
jdupree@dfdlaw.com

ATTORNEYS FOR PLAINTIFFS Beverly Kanawi
and Salvador Aquino as representatives of a class of
similarly situated persons, and on behalf of the Plan

## CERTIFICATION OF INTERESTED ENTITIES OR PERSON

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

/s/ Daniel V. Conlisk